ALEXANDER C. BULLETT AND OTHERS,
                vs.                                     } DECEMBER TERM, 1851.
    SAMUEL WORTHINGTON, AND
        WALTER WORTHINGTON.

[FRAUDULENT CONVEYANCES.]

THE fact, that a part of the consideration of a deed from a father to his son
    was paid in money, though it gives to the deed, in legal contemplation, the
    character of a bargain and sale, cannot preclude a Court of Equity from
    looking to the fact, that the difference between the sum paid, and the
    value of the property conveyed, was, in fact, a gift founded on the con-
    sideration of natural love and affection.
A father conveyed to his son land worth upwards of $20,000. The deed
    professed to be for the monied consideration of $12,000, but only $5,000
    was, in fact, paid in money by the son. HELD—that this was a voluntary
    conveyance to the extent of the excess of the value of the land over $5,000.
The services rendered by the son to the father, whilst he lived with him,
    and during his minority, cannot be set up as a part of the valuable con-
    sideration of the deed.
A father is entitled to the services of his son during the latter's minority,
    even though he does not live with him, and can maintain an action for
    such services, unless he has, by some act of his own, divested himself of
    his control over his son.
Indebtment, at the time of the execution of a voluntary conveyance, from
    a parent to a child, is *prima facie*, though not conclusive, evidence of a
    fraudulent purpose with respect to prior creditors.
But this presumption may be repelled by showing that the grantor or donor,
    at the time of the gift, was in prosperous circumstances, possessed of
    ample means to discharge all his pecuniary obligations, and that the
    settlement upon the child was a reasonable provision, according to his or
    her condition in life.
When the indebtedness of the grantor, and the voluntary character of the
    deed are established, it is incumbent on the party claiming under the deed
    to show affirmatively, and by evidence that leaves no reasonable doubt
    upon the subject, that the grantor did not, by the conveyance, strip him-
    self of the means to pay all his creditors, but that there remains to him
    abundant resources to satisfy them in full.
If there be a reasonable doubt of the adequacy of his means, or if his pro-
    perty be so circumstanced that delays, difficulties, and expense must be
    encountered before it can be made available to the prior creditors, the
    conveyance must fall.
If the remaining property of the grantor is encumbered, and litigation or
    difficulties must be encountered before the creditors can realize their

claims, they are hindered and delayed, and the presumption against the deed, for want of a valuable consideration, will be fatal to it.

Such a deed cannot, however, be impeached, because it may produce inequality among the children of the grantor.

Where there is a parol agreement respecting the purchase of lands, and a bond of conveyance is subsequently executed, this merges and extinguishes all previous agreements resting in parol.

A cross-interrogatory by the plaintiff, after referring to the previous statement of the witness, that he had given a bond of conveyance to the son, asked, "when he gave it, and in whose possession it is at this time?" In reply, the witness says, "he does not know; the bond will speak for itself; that it was and supposes now is, in possession of his son's counsel."

HELD—

That this did not prevent the plaintiff from excepting to parol proof of the date and contents of the bond, and that such exception should be sustained.

In this case, it being proved that, at the date of the conveyance to the son, the father was in embarrassed circumstances, the residue of his real estate being previously incumbered by mortgage, and the conveyance being voluntary, to the extent of near $16,000, the Chancellor decreed that it could not be permitted to stand against prior creditors.

[The facts of this case are sufficiently stated in the opinion of the Chancellor.]

THE CHANCELLOR:

After having listened, with great attention, to a very full and able discussion at the bar of the several questions of law and of fact which arise in this case, I have bestowed upon them the most careful consideration of which I am capable.

The cause is an important one, not only with reference to the amount of property involved in the decision, but the questions to be decided give additional interest to it, and I have, therefore, omitted no examination, and spared no pains to arrive at a correct conclusion, according to the best of my judgment.

The object of the bill is to vacate three deeds, executed by Walter Worthington, the father, to Samuel Worthington, the son, dated respectively on the 28th of March, 1825, and the 16th of June, 1825, and the 8th of September, 1826. The two first of these deeds are for a tract of land called

" *Gerar*," containing about two hundred and eighty acres,—the second of them being executed in consequence of some doubt concerning the validity of the acknowledgment of the first, which professes, upon its face, to have been executed for a moneyed consideration of twelve thousand dollars, paid by the grantee to the grantor.

The deed of the 8th of September, 1826, is a mortgage of negro slaves, and sundry other articles of personal property, to secure to the mortgagee, Samuel Worthington, the payment of the sum of $4,000, with interest from the 2d of June, 1825.

These deeds are all of them impeached by the complainants, creditors of Walter Worthington, and by his permanent trustee in insolvency, as having been made to delay, hinder, and defraud creditors, and as therefore void under the provisions of the statute 13 Elizabeth, ch. 5, and the last of them is also assailed as fraudulent and void under our insolvent system.

Though the deed of the land professes to have been made for a moneyed consideration of $12,000, the defendants do not say that that sum was in fact paid by Samuel Worthington, the ground taken in the answers being that he paid only $5,000, and that the difference between that sum and the value of the property conveyed, was not paid in money; that Samuel Worthington had always lived with his father, and, after he attained sufficient age to be useful, had worked for and served him, and that many years before the date of the deed, the father, actuated by natural love and affection, and by satisfaction with his past services and conduct, undertook and promised to purchase for his son a farm, and convey the same to him; and that in pursuance of this agreement, about the year 1817, the father purchased the land in question, and in the autumn of that year put the son in possession. That the land having cost a large sum of money, and more than the father was willing to give the son, it was stipulated that the latter should pay the father $5,000, and that the father should make the conveyance when that sum should be paid. That the son made to his father several payments, in part, of the

consideration money, and obtained from him an obligation for the conveyance, and that he finally paid the whole amount of $5,000, and, at or about the time specified, obtained the deed as stated in the bill.

The proceedings show that this parcel of land was purchased by Walter Worthington of Thomas L. Emory, as trustee under a chancery decree on the 2d of June, 1817, for the sum of $21,967 71, and that he obtained a conveyance therefor from the trustee on the 19th of May, 1821. It may, I think, therefore, be assumed, that the conveyance from Walter Worthington to his son, Samuel, of this land was a voluntary one, founded on natural love and affection, to the extent of the excess of its value over the sum of $5,000, which the answers allege was paid in money.

The mere fact, that a part of the consideration was paid in money, though it gives to the deed, in legal contemplation, the character of a bargain and sale, cannot be permitted to preclude this Court from looking at the fact disclosed by the answer, that the difference between the sum paid and the value of the property conveyed, was, in fact, a gift founded on the consideration of natural love and affection. If this were not so, then the payment of a comparatively very small sum, say one hundred dollars, would deprive the deed altogether of its voluntary character, and shelter the property from the demands of creditors, though the residue of the consideration was confessedly not valuable.

The answers, it will be observed, state that the son had continued to live with his father after he had attained an age to be useful, and that he had worked for and served him, and a strong effort has been made to prove, upon the authority of the adjudged cases, and in opposition to the complainant's exception, that it is competent to the defendants to support their deed by proof, that these services constituted a part of the consideration upon which it was made, so far, at least, as to repel the presumption of fraud founded upon the proof or admission that the entire moneyed consideration, expressed in the deed, was not paid.

I do not deem it necessary to express any opinion upon this question (which, perhaps, is not free from difficulty), because, under the circumstances of this case, and in view of the terms in which these services, as forming an inducement to the deed, are introduced in the answer, I do not regard them as brought forward for the purpose of showing that they constituted any portion of the valuable consideration upon which the deed was executed. It is clear to me, that the fact of the rendition of these services, by the son to his father, is relied upon in the answer of the son, not for the purpose of establishing any indebtedness from the father to his son in respect thereof, but for the purpose of showing that the natural love and affection of the father for the son, was strengthened and invigorated by the fact, that his son had lived with, and dutifully and faithfully served him. The language of the answer of the son is, that his father "actuated, as he believes, by natural love and affection, and by satisfaction with his past services and conduct, undertook and promised this defendant to purchase for him a farm, and convey the same, and settle him thereon;" "that the said farm having cost a very large sum of money, and more than his co-defendant was willing to give him, he expressly stipulated with this defendant that he should pay him $5,000 for said farm, and engaged, when said sum should be paid, to give him, this defendant, a deed for the same."

My impression, therefore, is clear and decided, that the only valuable consideration set up in support of this deed is the sum of $5,000, and that the property, so far as its value exceeded that sum, was settled by the father upon the son, in consideration of natural love and affection; this natural feeling being enhanced by the fact, that the son continued to live with, and serve his father, after he had attained an age to be useful to him.

But, even if the answer was susceptible of a different construction, and it is to be understood as meaning to set up these services, as constituting a part of the valuable consideration for the deed, and conceding the proof of them to be admissible (a point not meant to be decided), still I am of opinion it will

not avail the defendants, because the services were rendered whilst the son lived with the father, and during his minority. Under such circumstances, and, indeed, even though the son did not live with the father, still, being a minor, the father was entitled to his services, and could maintain an action for them, unless, by some act of his own, he had divested himself of his control over him. *Mercer* vs. *Walmsley*, 5 *H. & J.*, 27.

The deed, therefore, as I conceive, of the land to the son, must be regarded for all over the $5,000, paid in money, as voluntary, being founded on the consideration of natural love and affection ; and this presents the question, whether it was made under such circumstances as will protect the property from the claims of creditors ?

Though the term "voluntary" is not to be found in the statute, yet the construction put upon it by the highest court of this state is, that an indebtment at the time of a conveyance of that description, is *prima facie*, though not conclusive, evidence of a fraudulent purpose, with respect to the prior creditors, though this presumption may of course be repelled, by showing that the grantor or donor at the time of the gift, was in prosperous circumstances, possessed of ample means to discharge all his pecuniary obligations, and that the settlement upon the child, was a reasonable provision according to his or her condition in life. This was the conclusion to which the Court of Appeals came, in the case of *Worthington and Anderson* vs. *Shipley*, 5 *Gill*, 449, after a careful review of the authorities.

A principle of much greater sternness had been announced by Chancellor Kent, in the case of *Reade* vs. *Livingston*, 3 *Johns. Ch. Rep.*, 481, who held that the conclusion to be drawn from the cases, was that if the party be indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts, and no circumstance will permit those debts to be affected by the settlement, or repel the presumption of fraud. That the presumption of fraud does not depend upon the amount of the debts, or the extent of the property in settlement, or the circumstances of the party, and he declared

"that no such line of distinction could be set up or traced in any of the cases."

Following the rule thus relaxed by the Court of Appeals, the case of *Atkinson* vs. *Philips*, 1 *Maryland Chancery Decisions*, 507, was decided. But it was also held in that case, and as I conceive, in perfect conformity with the opinion in *Worthington and Anderson* vs. *Shipley*, that when the indebtedness of the grantor, and the voluntary character of the deed is established, it is incumbent on the party claiming under the deed, to show affirmatively that the grantor did not by the conveyance, strip himself of the means to pay all his creditors, but that there remained to him abundant resources to satisfy them in full. The same question came before me, and was considered and decided in the case of *Sewell* vs. *Baxter and Wife*, 2 *Maryland Chancery Decisions*, 447, and the principle again maintained, that when the prior indebtedness of the grantor in the voluntary conveyance is shown, the burden is thrown upon the grantee of establishing the circumstances which shall repel the presumption of fraud, and that the deed will stand condemned as fraudulent, with respect to prior creditors, unless the facts necessary to give it validity, are brought before the Court by the grantee.

That the grantee in a voluntary deed, made by a party indebted at the time, is required to remove the imputation of a fraudulent intent, by himself showing the abundance of the remaining property of the grantor to satisfy the claims of his creditors, I do not understand to be disputed, and an effort has been made in this case to exhibit such proof, though the defendants are not to be considered as admitting the deed to be voluntary.

Before the proof is examined, to ascertain whether the defendants have been successful in this attempt, I consider it proper to say, that the party who sets up a voluntary conveyance in opposition to the claims of pre-existing creditors, is required to show, by evidence which leaves no reasonable doubt upon the subject, that the means of the grantor, independent of the property conveyed, are abundantly ample to

satisfy them all.   If there be a reasonable doubt of the ade-
quacy of his means, or if his property be so circumstanced,
that delays, difficulties and expense must be encountered be-
fore it can be made available to his creditors, then, as I con-
ceive, the voluntary conveyance must fall, because then it has
the effect to delay and hinder his creditors.   The language of
the Court in *Salmon* vs. *Bennett*, 1 *Conn. Rep.*, 542, which case
was the principal foundation of the decision of the Court of
Appeals in *Worthington and Anderson* vs. *Shipley*, shows that
these voluntary deeds must yield to the superior claims of
creditors, if they operate either in prejudice of their rights or
will occasion embarrassment in the prosecution of them.
Speaking of voluntary conveyances which will be supported,
the Court say, " A voluntary conveyance made to a child in
consideration of natural love and affection, if the grantor is in
prosperous circumstances, unembarrassed and not considerably
indebted, and the gift is a reasonable provision for the child
according to his state and condition in life, comprehending but
a small portion of his estate, and leaving ample funds unen-
cumbered for the payment of the grantor's debts, then such
conveyance will be valid against debts existing at the time."

Now, although it may be quite possible that the validity of
a voluntary conveyance will not depend upon the disposition
which the grantor may make of his property among those who
have natural claims upon him, that is, that it cannot be im-
peached, because it may produce inequality among his chil-
dren, and, therefore, so far as his children are concerned, the
words " comprehending but a small portion of his estate " are
of no significancy, yet those words are very pregnant when
we are considering the rights of creditors.   The courts in
introducing them, as indicating one of the qualifications upon
the right of a party, who is in debt, to give away his property,
show a marked anxiety to take care that no prejudice shall be
done to creditors, and the employment of the other words,
"and leaving ample funds unencumbered for the payment of
the grantor's debts," in the same connection, and as a further
restraint upon the power of the donor to part with his pro-

perty, shows, I think, not only that enough shall remain to satisfy his creditors, but that this residuum shall be readily and conveniently accessible to them, and that they shall not be exposed to the expense, delay and difficulty of removing incumbrances from their way. If the remaining property of the grantor is encumbered, and litigation or difficulties must be encountered before his creditors can realize their claims, they are by the voluntary conveyance hindered and delayed. It cannot be said, under such a state of facts, that the grantor is in prosperous circumstances and unembarrassed, and the presumption against the deed for want of valuable consideration will be fatal to it.

I conclude, therefore, that though this Court may not concern itself with the distribution of the property of the parent among his children, it will not permit the claims of pre-existing creditors to be put in jeopardy by a voluntary conveyance from the parent to his child or children, nor will it suffer a deed of that description to stand, unless it be clearly shown that the grantor had left to him ample means to discharge all his obligations, but that these means are unencumbered and readily and conveniently accessible to his creditors. This, I understand, to be the true doctrine upon the subject, as it now stands, divested of much of the rigor of the earlier cases, and especially of the case of *Reade* vs. *Livingston*, before referred to, and it becomes, therefore, necessary to inquire whether the deeds of the 25th of March, 1825, and the 16th of June, 1825, the latter having been executed, to cure some supposed defect in the former, can receive the sanction of this Court when brought to the test of the principle as now understood.

It has been strenuously and forcibly urged by the counsel for the defendant, Samuel Worthington, that his title to the land conveyed by these deeds does not depend upon the condition of the affairs of Walter Worthington at the date of their execution, but that the question to be decided depends upon his situation in the year 1817, when the grantor purchased the lands from Mr. Emory, and when he gave his son a verbal promise that he would purchase a farm for him and

settle him on it.   It is insisted, that having made the purchase from Mr. Emory, and the son having taken possession, and having made improvements upon it, his equitable title dates from that period, and that if the pecuniary condition of the father at that time justified such a settlement upon the son, his subsequent embarrassments cannot be allowed to defeat it. It appears, however, from the evidence of the father, who was examined as a witness for the defendants under an order, that he subsequently gave his son a bond of conveyance for the land, and that as the land was worth more than he thought he could give to each of his children, his said son agreed to pay him five thousand dollars.   If, therefore, the previous verbal agreement had reference to this particular parcel of land, (of which, however, there is no evidence,) it is quite clear that it was subsequently modified, and that the actual agreement between the son and the father, is to be found in the bond of conveyance in which all previous agreements, resting in parol, are merged and extinguished.   *Parkhurst* vs. *Van Cortlandt*, 1 *Johns. Ch. Rep.*, 273.   This bond, which appears from the evidence of Walter Worthington, was, and he presumed, is now, in the possession of the counsel of his son, is not produced, nor is its absence accounted for in any way, but, nevertheless, it is urged that there is sufficient evidence of its date and contents, to authorize this Court to give the defendant the benefit of it, in the determination of the question before it.   The witness, in his examination in chief, after stating that he gave his son the bond, some time after the purchase of the property in 1817 from Mr. Emory, said he did not recollect the date, but that the bond would speak for itself. And it is admitted, that so far as the question depends upon the proof, the date and contents of the bond are not properly before the Court as evidence.   But it is supposed, and has been insisted, that by the cross-examination, the objection to the admissibility of the parol evidence is removed, and that this Court must decide the cause with reference to it, thus carrying back the inception of the defendant's title to a date anterior to the deed of 1825.

I am not at all prepared to say, that if the plaintiff, upon the cross-examination, had asked the witness to state the date and contents of the bond, and the witness had done so, it would be competent to the plaintiff to except to the admissibility of the evidence. Under such circumstances, I should have been very much inclined to think, that the question would have been governed by the decision of the Court of Appeals in *Boteler and Belt* vs. *Beall,* 7 *G. & J.,* 397, 398, where hearsay evidence, not otherwise admissible, was made so by being brought out on the cross-examination of the party, who interposed the exception at the hearing. But the question put upon the cross-examination in this case, after referring to the previous statement of the witness upon the examination in chief, that he, the witness, had given a bond of conveyance to his son, asks when he gave it, and if the witness knows in whose possession it is at this time. And in reply to this question, he says, "he does not know, the bond will speak for itself. Judge Heath was Samuel Worthington's counsel, and the bond was, and he supposes now is, in his possession." The inquiry, then, as to the date of the bond is not answered. So far from it, the witness says he does not know when he gave it, and refers to the bond itself for the information sought for by the question, and in addition states who had and he supposes still has the custody of it. The case, therefore, differs widely from that of *Boteler and Belt* vs. *Beall,* in which the witness answered the question put to him upon the cross-examination, and having answered it, and the information not proving acceptable to the party who called for it, the Court decided it did not lie in his mouth to object to its admissibility. But in this case, the witness expressly says, he is unable to give the information called for by the interrogatory, and points to the source whence it may be obtained, and this source being within reach of the adverse party, no presumption favorable to him can be drawn for the non-production of the paper.

I am, therefore, of opinion, that the exception of the complainants, to the parol proof of the gift, or promise to give, of 1817, and of the date or contents of the bond of conveyance

is well taken, and that the deeds of the 28th of March and 16th of June, 1825, must stand or fall upon the state of circumstances existing at the date of the first of them, when tried by the principles which I have already stated, are applicable to voluntary conveyances from parent to child. And, it remains, therefore, to be seen, whether, consistently with those principles, Walter Worthington was in a condition in 1825 to give his son, sixteen or seventeen thousand dollars worth of property. I say sixteen or seventeen thousand dollars, because, the property cost $21,967 71; and there is no pretence that Samuel Worthington paid, or was required to pay more than $5000. The difference was a gift for the consideration of natural love and affection.

The record of the application of Walter Worthington, for the benefit of the insolvent laws, on the 7th of January, 1828, is among the proceedings, and has been relied upon by both parties, in the argument before me. That record shows that at the date of his application, he owned but forty acres of land, and his credits amounted to less than $350, and that his debts returned upon the list amounted to $3,067 36. At that time therefore, he was unquestionably insolvent in fact as well as in law. It appears, moreover, that the petitioner was examined upon interrogatories put to him, on behalf of his creditors, and in answer to the question, " what property he possessed three years prior to his application for the benefit of the insolvent law ?" he says, " that three years ago, he held and owned two parcels of land containing about four hundred and fifty acres," that he held these lands subject to a mortgage to C. S. W. Dorsey, dated 2d of June 1826; to John Tolly Worthington, dated the 16th of April, 1823; and on the 5th of August, 1825; and to John T. H. Worthington, dated the 6th of June, 1826. That afterwards, on the 8th of September, 1826, he sold the equity of redemption to John T. H. Worthington and conveyed the same to him. That besides the money secured by the mortgages, he received about $6000 from John T. H. Worthington. That he owned no other real property to the best of his knowledge. That he owned personal property

consisting of negroes, &c. Some of the negroes died and some he sold to Georgia. The residue, together with all his other personal property, he conveyed by mortgage to Samuel Worthington, on or about the —— day of June, 1826. That at the time he executed the mortgage, he was largely indebted to Samuel Worthington, and that when he executed the absolute conveyance, he received from him the further sum of $600 in cash. That his real estate was mortgaged for about ten thousand dollars." In addition to the evidence obtained from Walter Worthington, in this way he was examined under the commission issued in this case, and upon the cross-examination he says, "the mortgaged lands were sold to pay the mortgage debts, and did not sell for quite enough to pay them."

An agreement has been filed by which it appears, that one of the claims of the suing creditors, accrued as early as the 5th of May, 1822, and a bond is filed dated the 8th of July, 1822, in which Walter Worthington united with his son Charles as his surety in the penalty of $5000, conditioned for the performance by Charles of his duty as trustee under a decree of Baltimore County Court. The claims of the other suing creditors accrued on the 2d of June, 1825, the 8th of May, 1825, the 2d of June, 1825, and the 2d of February, 1827. Six of these creditors obtained judgments against Walter Worthington at September term, 1826, and March term, 1827. Their claims remain unsatisfied, and the question is whether the deed from Walter Worthington to his son Samuel, so far as it is a voluntary one, shall be allowed to stand and be maintained to their prejudice? That these creditors have in point of fact been delayed and hindered by these deeds is quite apparent; and it is very certain, whatever may have been the estimate made by the grantor, at the time of their execution, of his pecuniary condition, that he was greatly mistaken. And it is also very certain that the residue of his real estate was encumbered before the date of the conveyance from Walter to Samuel Worthington, as he himself states that the mortgage to John Tolly Worthington was executed in April, 1823.

I do not therefore think that the defendants have succeeded

in showing that at the date of the deed in question the grantor had ample and unencumbered means over and above the property conveyed by it to pay his debts. It is most manifest that at or about that time his difficulties clustered about him. That even before then he sold some of his slaves to slave-dealers—a measure not often resorted to but under the pressure of some necessity. And taking all the circumstances into consideration, I think I should be relaxing still more, and to a pernicious extent the rule which guards the rights of creditors against voluntary conveyances, and therefore the deed cannot in my judgment be permitted to stand in this case.

Before, however, a decree is passed vacating the deeds, I shall send the case to the Auditor for the purpose of ascertaining the amount due complainants, distinguishing between such as accrued before and after the deed of the 25th of March, 1825, and directing him also to ascertain the amount paid by Samuel Worthington to Walter Worthington on account of the land as stated in the proceedings. Considering that the bill in this case was filed on the equity side of Baltimore County Court as far back as September, 1831, having been transferred to this Court in September, 1850, it is quite probable that there are no other parties who can come in upon the fund which may be raised by a sale of this land, should a sale be decreed, and hence it would seem proper in the first instance, and before passing a final decree, that the precise amount of the claims for which the property may be liable should be previously ascertained. The question and the only question now decided is that the deeds of March and June, 1825, cannot be permitted to stand as against the prior creditors of the grantor. The question of the responsibility of the property conveyed for the claims of subsequent creditors as well as every other question raised in this cause will be reserved.

I do not think the complainants have succeeded in impeaching the deed of the 8th of September, 1826, either as being obnoxious to the statute of Elizabeth or to the provisions of the insolvent laws. The evidence shows, I think, clearly that the consideration money was paid, and the circumstances relied

upon to show that it is void under the insolvent system, as the laws constituting that system have been construed by the courts are, I think, too light and inconclusive in opposition to the proof the other way. That deed therefore must be allowed to stand.

S. T. WALLIS and R. JOHNSON, jr., for Complainants.
JOHN NELSON and JAMES M. BUCHANAN, for Defendants.

[Both parties appealed from the decree of the Chancellor passed in accordance with the above opinion which appeals are still pending.]